## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOYCE MOUSTY GRIDER, On Behalf of Herself and All Others Similarly Situated, | **CIVIL ACTION NO.:** |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYER RETIREMENT INCOME SECURITY ACT** |
| THE ADMINISTRATIVE COMMITTEE OF THE TOWER COLLEAGUE STOCK DISCOUNT PURCHASE PLAN, KATHLEEN LIGOCKI CHRISTOPHER T. HATTO ANTHONY G. FERNANDES, ALI JENAB, JAMES A. MALLAK, S.A. JOHNSON, DR. JUERGEN M. GEISSINGER, F. JOSEPH LOUGHREY, GEORGIA NELSON, DUGALD K. CAMPBELL, and JOHN DOES 1-30, | |
| Defendants. | |

Plaintiff Joyce Mousty Grider, a participant in the Tower Automotive Colleague Stock Discount Retirement Plan ("Stock Discount Retirement Plan" or the "Plan"), on behalf of herself and a class of all others similarly situated, alleges as follows:

### INTRODUCTION

1.   This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against Plan fiduciaries.[1]

_____

[1]   On February 2, 2005, Tower Automotive, Inc. ("Tower Automotive" or the "Company") and its domestic subsidiaries, filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York seeking reorganization relief under the provisions of Chapter 11 of Title 11 of the United States Code (the "Cases").  The Cases have been assigned

2.    A 401(k) plan confers tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in a 401(k) plan may have the option of purchasing the common stock of his employer, often the sponsor of the plan, for part of his retirement investment portfolio.

3.    Plaintiff Joyce Mousty Grider is an employee of Tower Automotive and is a participant in the Tower Automotive Colleague Stock Discount Retirement Plan.

4.    Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to her and to the other participants and beneficiaries of the Plan in violation of ERISA.

5.    Defendants are liable under ERISA to restore losses sustained by the Plan participants as a result of their breaches of their fiduciary obligations.

<u>**NATURE OF ACTION**</u>

6.    Plaintiff, who is a participant in the Plan during the time period relevant to this Complaint, brings this civil enforcement action under Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), for plan-wide relief on behalf of the Plan, and on behalf of a

---

to the Honorable Allan L. Gropper and are being jointly administered. The Debtors continue to operate their business as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and the orders of the Bankruptcy Court.

class (the "Class") consisting of all current and former
participants in the Plan at any time from January 1, 2003 to the
present (the period from January 1, 2003 to the present being
hereinafter referred to as the "Class Period").  Excluded from
the Class are Defendants herein, officers and directors of Tower
Automotive, members of Defendants' immediate families, and the
heirs, successors or assigns of any of the foregoing.  Plaintiff
brings this action on behalf of the Plan and the Class pursuant
to § 502(a)(2) and (3) of ERISA, 29 U.S.C. § 1132(a)(2).  As more
fully set forth below, Defendants breached their fiduciary duties
to the Plan and the participants, including those fiduciary
duties set forth in ERISA Section 404, 29 U.S.C. § 1104, and
Department of Labor Regulations, including 29 C.F.R. 2550.
Defendants breached their fiduciary duties to the Plan and the
participants in various ways, including, but not limited to: (i)
misrepresenting and failing to disclose material facts to the
participants in connection with the administration of the Plan;
(ii) failing to exercise their fiduciary duties to the Plan and
the participants solely in the interests of the participants for
the exclusive purpose of providing benefits to participants;
(iii) failing to manage the Plan's assets with the care, skill,
prudence and diligence of a prudent person under the
circumstances and imprudently failing to divest the investments
in the Plan so as to minimize the risk of large losses, and (iv)

3

permitting the participants to continue to elect to invest their retirement monies in the common stock of Tower Automotive when it was imprudent to do so and when the participants were not provided with timely, accurate and complete information concerning the Company as required by applicable law.  As a result of these wrongful acts, pursuant to ERISA Section 409(a), 29 U.S.C. § 1109(a), Defendants are personally liable to make good to the Plan the losses resulting from each such breach of fiduciary duty.  Plaintiff also seeks equitable relief.

## JURISDICTION AND VENUE

7.   Plaintiff's claims arise under and pursuant to ERISA Section 502(e)(1), 29 U.S.C. § 1132(e)(1).

8.   This Court has jurisdiction over this action pursuant to ERISA Section 502(e)(l), 29 U.S.C. § 1132(e)(l).

9.   Venue is proper in this District because the Company's bankruptcy case is pending in this District.

## THE PARTIES

10.  Plaintiff Joyce Mousty Grider is a resident of the County of Crawford in the State of Indiana.  Plaintiff is a participant in Tower Automotive Colleague Stock Discount Retirement Plan.

11.  Defendant Administrative Committee of the Tower Automotive Colleague Stock Discount Retirement Plan (the "Retirement Committee") administered the Plan during the Class

4

Period and at times relevant to this Complaint.

12.   At certain times relevant to this Complaint, Defendant Christopher T. Hatto ("Hatto") was Tower Automotive's Chief Accounting Officer.  Defendant Hatto was at all times relevant to this Complaint a Plan fiduciary with respect to the Plan.  Upon information and belief, Hatto was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.  Upon information and belief, Hatto was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

13.   Defendant Kathleen Ligocki ("Ligocki") was, during all or part of the Class Period, Director, President and Chief Executive Officer of Tower Automotive.  Defendant Ligocki was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan.  Upon information and belief, Defendant Ligocki was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

14.   Defendant Anthony G. Fernandes ("Fernandes") was, during all or part of the Class Period, a Director of Tower

5

Automotive.  Defendant Fernandes was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan.  Upon information and belief, Defendant Fernandes was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

15.  Defendant Ali Jenab ("Jenab") was, during all or part of the Class Period, a Director of Tower Automotive.  Defendant Jenab was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan.  Upon information and belief, Defendant Jenab was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

16.  Defendant James A. Mallak ("Mallak") was, during all or part of the Class Period, Chief Financial Officer of Tower Automotive.  Defendant Mallak was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan.  Upon information and belief, Defendant Mallak was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

6

17.   Defendant S.A. Johnson ("Johnson") was, during all or part of the Class Period, a Director and Chairman of the Board of Tower Automotive.  Defendant Johnson was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan.  Upon information and belief, Defendant Johnson was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

18.   Defendant Juergen M. Geissinger ("Geissinger") was, during all or part of the Class Period, a Director of Tower Automotive.  Defendant Geissinger was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan. Upon information and belief, Defendant Geissinger was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

19.   Defendant F. Joseph Loughrey ("Loughrey") was, during all or part of the Class Period, a Director of Tower Automotive. Defendant Loughrey was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan.  Upon information and belief, Defendant Loughrey was a fiduciary of the Plan within the meaning of ERISA in that he exercised

7

discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

20. Defendant Georgia Nelson ("Nelson") was, during all or part of the Class Period, a Director of Tower Automotive. Defendant Nelson was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan.  Upon information and belief, Defendant Nelson was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

21. Defendant Dugald K. Campbell ("Campbell") was, during all or part of the Class Period President and Chief Executive Officer of Tower Automotive (Campbell resigned as the Company's CEO on August 18, 2003).  Defendant Campbell was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan.  Upon information and belief, Defendant Campbell was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

22. Defendants John Does 1-30 are any individual members of the Committee, or any other committee which administered or helped to administer the Plan.  The identity of any members of

8

the Committee, or of any other committee which administered or
helped to administer the Plan, is currently not known.

## CLASS ACTION ALLEGATIONS

23.   Plaintiff brings this action on her own behalf and,
pursuant to Rules 23(a),(b)(l), (b)(2) and (b)(3) of the Federal
Rules of Civil Procedure, on behalf of a class of all current and
former participants in the Plan at any time from January 1, 2003
to the present.  Excluded from the Class are Defendants herein,
officers and directors of Defendant Tower Automotive, members of
individual Defendants' immediate families, and the heirs,
successors or assigns of any of the foregoing.

24.   The members of the Class are so numerous that joinder
of all members is impracticable.  While the exact number of Class
members is unknown to Plaintiff at this time and can only be
ascertained through appropriate discovery, Plaintiff believes
that there were hundreds, if not thousands, of present and former
employees of Tower Automotive who held shares of Tower Automotive
common stock in their individual accounts under the Plan.

25.  Common questions of law and fact exist as to all
members of the Class which predominate over any questions
affecting solely individual members of the Class.  Among the
questions of law and fact common to the Class are:

       (a)   Whether Defendants were fiduciaries;

       (b)   Whether Defendants breached their fiduciary

duties;

(c)   Whether the Plan and the Participants were injured by such breaches; and

(d)   Whether the Class is entitled to damages and injunctive relief.

26.   Plaintiff's claims are typical of the claims of the other members of the Class as Plaintiff and all members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

27.   Plaintiff will fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained able counsel with experience in ERISA class action litigation.  The interests of Plaintiff are coincident with and not antagonistic to the interests of the other Class members.

28.   Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants.  In addition, adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

29.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## DESCRIPTION OF THE PLAN

30.  At all times relevant to this Complaint, the Plan was employee benefit plan within the meaning of ERISA Sections 3(2)(A) and 3(3), 29 U.S.C. §§ 1002(2)(A) and 1002(3).

31.  At all times relevant to this Complaint, the Plan was "defined contribution" or "individual account" plan within the meaning of ERISA Section 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual account(s) for each participant and for benefits based solely upon the amount contributed to the participant's account(s), and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which could be allocated to such participant's account(s).

32.  Any employee of the Company or a Covered Entity is eligible to participate in the Plan on the first day of any Plan Quarter immediately following the first day of such employee's

employment with the Company or such Covered Entity.

33.   Election to Participate in the Plan; Payroll

Deductions.

      (a)   An eligible employee may elect to participate in the Plan as of the first day of any Plan Quarter by correctly completing and returning to the Company an enrollment form authorizing the Company or the Covered Entity to deduct a specified amount from each of such employee's subsequent paychecks (each a "Payroll Deduction") for the purchase of Shares under the Plan.  All Payroll Deductions shall be made regularly and in equal amounts and shall be credited to such employee's Cash Account. Such credit shall constitute only a bookkeeping entry by the Company and no interest shall become due or payable on any amount contributed by or credited to any such employee pursuant to the Plan. Employees who elect to participate in the Plan are referred to herein as "Participants."

      (b)   The minimum allowable Payroll Deduction shall be Ten Dollars ($10) per week.

      (c)   Each Participant shall be deemed to have authorized the same Payroll Deduction for each subsequent payroll period provided that such Participant is eligible to participate during each such payroll period.  A Participant may increase or decrease his or her Payroll Deduction as of the first day of any Plan Quarter by filing the appropriate form, in the time and manner prescribed by the Committee.

      (d)   If a person ceases to be a Participant, or if for any reason the Company does not use the entire balance in a Participant's Cash Account to purchase Shares, then such unused balance shall be returned to such person.

## ADMINISTRATION OF THE PLAN

34.   Defendant Retirement Committee was the Administrator of

the Plan within the meaning of ERISA Section 3(16)(A), 29 U.S.C.

§ 1002(16)(A), during the Class Period because they have been so designated.

35.   At all times relevant to this Complaint, all defendants were fiduciaries of the Plan as defined by ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control respecting management and exercised discretionary authority or control respecting management, disposition of assets and had discretionary authority or responsibility in the administration of the Plan.

36.   Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA Section 405, 29 U.S.C. § 1105.

## BREACHES OF FIDUCIARY DUTY

37.   During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

38.   During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

39.   ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." Section 402(a)(l), 29 U.S.C. § 1102(a)(l).

13

40.  Upon information and belief, instead of delegating all
fiduciary responsibility for the Plan to external service
providers, Tower Automotive chose to internalize this fiduciary
function.

41.  The Plan is administered by Tower Automotive.  The
Company has discretionary authority to manage and control the
operation and administration of the Plan, and is a named
fiduciary of the Plan.

42.  ERISA treats as fiduciaries not only persons explicitly
named as fiduciaries under § 402(a)(l), but also any other
persons who act in fact as fiduciaries, _i.e._, performed fiduciary
functions.  Section 3(21)(A)(I) of ERISA, 29 U.S.C.
§ 1002(21)(A)(I), provides that a person is a fiduciary "to the
extent . . . he exercises any discretionary authority or
discretionary control respecting management of such plan or
exercises any authority or control respecting management of
disposition of its assets . . . ."  During the Class Period,
Defendants performed fiduciary functions under this standard, and
thereby also acted as fiduciaries under ERISA.

43.  In addition, under ERISA, in various circumstances,
non-fiduciaries who knowingly participate in fiduciary breaches
may themselves be liable.  To the extent any of the Defendants
are held not to be fiduciaries, they remain liable as
non-fiduciaries who knowingly participated in the breaches of

14

fiduciary duty described below.

44.  During the Class Period, Tower Automotive's direct and indirect communications with Plan participants included material misrepresentations and omissions which caused Plaintiff and members of the Class to purchase, and to hold and maintain, investments in Tower Automotive stock, and to accept at face value investments in Tower Automotive stock.  These communications included, but were not limited to Company SEC filings, annual reports, and press releases.  Tower Automotive also acted as fiduciaries to the extent of this activity.

### DEFENDANTS' CONDUCT

45.  On February 14, 2003, the Company issued a press release announcing its financial results for the fourth quarter and year end of 2002, the period ended December 31, 2002.  The company reported increased sales and earnings for both periods and an improved balance sheet versus the prior year.  For the quarter, the Company reported revenues of $681.6 million and net income of $17.3 million.  Defendant Campbell, commenting on the results, stated, in pertinent part, as follows:

> Our long-term enterprise objectives continue to be the generation of free cash flow to strengthen our balance sheet, to improve our returns on the capital we employ in the business, and to win attractive new business. When we take a look at 2002 as a whole, although we have made significant improvements, we are not completely satisfied with our progress to date on some of these objectives.  We will continue to focus on

15

> reducing our capital intensity and generating
> additional cash.  We maintain a backlog of
> $1.4 billion of new business, two-thirds of
> which will be launched by the middle of 2004,
> and over half of which will run on existing
> capacity.
>
> For 2003, we anticipate a year that includes
> launch activity related to several of the new
> projects in this backlog, with capital
> expenditures of approximately $200 million.
> We are confident that the successful launches
> of these new platforms and their relatively
> lower capital requirements will result in
> improved operating results and increasing
> returns on capital for Tower Automotive in
> the coming years.  We expect sales and
> operating earnings for the first quarter 2003
> and full year 2003 to remain relatively
> consistent with 2002 levels.  We expect ample
> liquidity to fund our capital investments and
> other cash requirements in 2003.

46.  On April 22, 2003, the Company issued a press release announcing its financial results for the first quarter of 2003, the period ended March 31, 2003.  For the quarter, the Company reported revenues of $733 million and net income of $12 million, or $0.21 per diluted share.  Defendant Campbell, commenting on the results, stated, in pertinent part, as follows:

> While sales were up compared to last year,
> softening in certain platform volumes tended
> to offset strong Dodge Ram, Ford Expedition
> and Cadillac CTS sales.  Our focus for 2003
> is to ensure the new Volvo, Nissan and GM
> launches are flawless, and at the same time
> implement swift countermeasures to mitigate
> the impact of any further reduction in
> customer production releases.

47.  On June 18, 2003, the Company announced that its wholly owned subsidiary, R.J. Tower Corporation, successfully completed

an amendment to its senior credit facility which will enhance the Company's overall liquidity and provide flexibility to redeem its $200 million convertible subordinated debentures prior to their maturity on August 1, 2004.  The Company agreed to grant security to its lenders in certain assets of R.J. Tower and to reduce the total borrowing capacity under the facility by $125 million in conjunction with the amendment, which also includes more flexible financial covenants.

48.  The bank amendment, which has an effective date of June 13, 2003, was completed in conjunction with R.J. Tower's previously announced issuance of $258 million of 12% senior unsecured notes.  The net proceeds from the notes offering were approximately $240.8 million after related financing costs and original issue discount.  Ernie Thomas (Chief Financial Officer of Tower Automotive at that time), commenting on the effect of the amendment, stated, in pertinent part, as follows:

> The combination of the senior notes offering and amendment to our senior credit facility has accomplished our objectives of extending the maturities of our capital structure and providing additional liquidity under our existing credit agreements.  In particular, these transactions allow us to improve our liquidity during the next 12 months as we complete the launch of two-thirds of our new business backlog of $1.4 billion, which will result in net new business to Tower of $900 million through 2005.

49.  On July 22, 2003, the Company issued a press release announcing its financial results for the second quarter of 2003,

the period ended June 30, 2003.  For the quarter, the Company reported revenues of $743 million and a net loss of $2 million, or $0.04 per diluted share.  Defendant Campbell, commenting on the results, stated, in pertinent part, as follows:

> For the quarter, we converted well on higher than expected sales.  We also generated $112 million of cash from operations, which exceeded our capital spending of $58 million for the quarter.  Our recent debt restructuring has improved the financial flexibility of our enterprise and our launch activity is on track.

50.  On October 23, 2003, the Company issued a press release announcing its financial results for the third quarter of 2003, the period ended September 30, 2003.  For the quarter, the Company reported revenues of $623 million and a net loss of $101 million, or $1.78 per diluted share.  Defendant Ligocki, commenting on the results, stated, in pertinent part, as follows:

> Tower Automotive faced several challenges during the third quarter, including the impact of lower sales volumes related to labor disruptions at Hyundai and Kia facilities in South Korea.  We also recorded significant asset impairment charges to align the company's balance sheet with our current business plan.  We are in the midst of several major program launches, which underlie our revenue growth over the next few years, and our top priority for our customers and shareholders is to deliver on the promise that growth represents.

Concerning the Company's outlook, the press release continued, in pertinent part, as follows:

> The company expects fourth-quarter revenues

18

to be between $680 million and $700 million,
which would result in revenues for the full
year 2003 of approximately $2.8 billion.  The
company expects a net loss in the fourth
quarter of approximately $0.26 per share on a
GAAP basis, including pre-tax asset
impairment and restructuring charges of $12.0
million, or $0.14 per share on an after-tax
basis, that the company expects to record
during the quarter.  For the full year 2003,
the company expects a net loss of $1.88 per
share on a GAAP basis.

The company expects fourth-quarter EBITDA, a
non-GAAP measure the company defines as
earnings before interest, taxes, depreciation
and amortization, and noncash restructuring
and asset impairment charges, of between $50
and $60 million, which would result in
full-year 2003 EBITDA of between $240 and
$250 million (a reconciliation of EBITDA to
net income is attached in Table A).

In addition, Tower Automotive revised its
outlook for capital expenditures.  The
company now anticipates capital expenditures
for 2003 will be approximately $240 million,
compared to previous estimates of
approximately $200 million.  This increase is
primarily associated with additional spending
at the company's new facility in Ford's
supplier park in Chicago.  Tower Automotive
continues to anticipate that revenues will
grow between 12 percent and 15 percent from
2003 to 2005.

51.  On December 5, 2003, the Company issued a press release
announcing that it will not relocate production of the frames for
the Ford Ranger pick-up truck from its Milwaukee facility to a
plant in Bellevue, Ohio, as previously planned.  Defendant
Ligocki, commenting on the agreement to continue producing Ford
Motor Co.'s Ranger frames, stated, in pertinent part, as follows:

19

> We recently reached new labor agreements with
> the unions at Milwaukee and now have more
> information with which to evaluate the
> operational and cost effectiveness of the
> initial decision to relocate.  In addition to
> continuing to execute on our existing
> programs like the Ranger, we also remain
> intensely focused on launching our many new
> 2004 programs in a flawless manner for our
> customers.

The press release continued, in pertinent part, as follows:

> Following a complete review of the relocation
> project, the Company determined that the
> move, originally announced in May, is no
> longer in its best interests.  When
> originally announced in May 2003, the company
> estimated that moving the Ranger production
> line to Bellevue would result in annual cash
> savings of $10 million upon completion of the
> move.  This estimate was reduced to $5
> million after analysis of recent factors
> related to the move of the Ranger production
> line.

> The company previously recorded pre-tax
> charges related to the planned move totaling
> $25.0 million in the second and third
> quarters of 2003.  These charges included
> cash restructuring charges of $4.7 million,
> pension curtailment costs of $7.7 million and
> non-cash asset write-offs of $12.6 million.
> The company will reverse the $7.7 million of
> these charges related to pension curtailment
> costs in a subsequent period. Total cash
> restructuring costs for fully implementing
> the move were estimated at $16 million, plus
> $7 million in related capital costs in 2004.

52.  On February 12, 2004, the Company issued a press

release announcing its financial results for the fourth quarter

and year end of 2003, the period ended December 31, 2003.  For

the quarter, the Company reported revenues of $717 million and a

net loss of $25 million, or $(0.43) per diluted share.  Defendant Ligocki, commenting on the results, stated, in pertinent part, as follows:

> In the fourth quarter, we saw stronger volumes overall, which led to better than expected operating results.  While our operating performance exceeded expectations, our reported results were impacted by several items, including a write-down to market value of a publicly traded joint venture.  Looking forward, our top priorities for 2004 continue to be keeping our launches on-track while focusing on cash flow and continuing to make fundamental improvements in operations.

Concerning the Company's future outlook, the press release continued, in pertinent part, as follows:

> The company expects an increase in full-year 2004 revenues to approximately $3.2 billion, up from $2.8 billion in 2003, reflecting the addition of several new programs.  Earnings per share are expected to be in the range of $0.25 to $0.40 per share for 2004.  First quarter 2004 revenues are expected to be between $760 and $770 million, and earnings are expected to be a loss of between $(0.07) and $(0.03) per share for the quarter.
>
> The company anticipates that EBITDA for the full year 2004 will be between $270 million and $285 million, including EBITDA of approximately $55-60 million in the first quarter of 2004.  Net capital expenditures are expected to be approximately $195 million for the full year 2004.
>
> The company's estimates for earnings per share and EBITDA exclude restructuring charges, which are expected to be approximately $0.01 to $0.02 per share per quarter based on previously announced restructuring activities.

53.  On March 8, 2004, the Company issued a press release announcing that it will restate its full year 2003 and fourth quarter results, resulting in a wider net loss than previously reported.  The press release stated, in pertinent part, as follows:

> Tower Automotive previously announced its fourth quarter 2003 results in a press release dated February 12, 2004.  Those results included an extraordinary gain at its Metalsa joint venture in Mexico of $9.1 million, related to a tax planning transaction at the venture.  The recognition of the gain had initially been determined by the company's independent auditors and accepted by the company.  Upon further review by the independent auditors, the initial position was changed and the auditors concluded and the company agreed that under accounting principles generally accepted in the United States, the recognition of this gain should be deferred and recognized on a quarterly basis based on the joint venture's taxable earnings.  Accordingly, the company has reversed the previously reported extraordinary gain and is recognizing a portion in the fourth quarter of 2003 as additional joint venture equity earnings of $1.2 million, offset by additional deferred tax expense of approximately $0.4 million in the quarter.  This change has no effect on the company's previously reported operating loss or cash flows for the fourth quarter or year ended December 31, 2003.
>
> As a result of reversing the previously reported extraordinary gain, the company's fourth quarter 2003 net loss is now $33.0 million, or $0.58 per share, versus a previously reported net loss of $24.7 million, or $0.43 per share.  The company's net loss for the twelve months ended December 31, 2003 is now $124.7 million, or $2.20 per share, versus a previously reported net loss

of $116.4 million, or $2.05 per share.

54.  On April 29, 2004, the Company issued a press release announcing its financial results for the first quarter of 2004, the period ended March 31, 2004.  For the quarter, the Company reported revenues of $781 million and net income of $12.0 million, or $0.21 per diluted share.  Defendant Ligocki, commenting on the results, stated, in pertinent part, as follows:

> Our first quarter results demonstrate our dedication to launching our new business awards successfully, while driving fundamental operational improvements across the company.  We are pleased we were able to exceed our earnings goals in the face of challenging market conditions.

The Company also announced that it is pursuing a refinancing plan.  Concerning the refinancing plan, the press release continued, in pertinent part, as follows:

> Tower Automotive also announced today that it is pursuing a refinancing plan with financial institutions that, if consummated, would improve the company's financial flexibility by extending debt maturities and increasing available liquidity.  As currently envisioned by the company, the refinancing plan would include a new senior secured credit facility as well as a capital markets transaction which, when taken together, would provide sufficient proceeds to repay the company's existing credit facilities; refinance the company's 5% Convertible Subordinated Notes due August 1, 2004; and build additional liquidity for the company.  The company expects the refinancing to be completed prior to the end of the second quarter.  There are no assurances that the refinancing plan will be consummated.

"The refinancing, if consummated, will give
Tower Automotive a much more workable debt
structure and will provide the financial
flexibility appropriate for not only the
upcoming period of launch activity, but also
for the significant free cash flow we expect
to generate in the second half of 2004 and
beyond," commented Ligocki.

Concerning the Company's future outlook, the press release

stated, in pertinent part, as follows:

The company expects full year 2004 revenues
of approximately $3.2 billion, up from $2.8
billion in 2003, reflecting the launch of
several new programs.  As a result of the
recent divestiture of the company's
investment in Yorozu, earnings per share are
now expected to be in the range of $0.25 to
$0.30 per share for 2004.  Second quarter
2004 revenues are expected to be between $770
million and $790 million, and earnings are
expected to be between break-even and $0.06
per share for the quarter.

The company continues to anticipate EBITDA
for the full year 2004 of between $270
million and $285 million, including EBITDA of
approximately $65 million to $75 million in
the second quarter of 2004.  Capital
expenditures continue to be expected to total
approximately $240 million for the full year
2004.

The company's estimates for earnings per
share and EBITDA exclude restructuring
charges and divestiture gains.  Cash
restructuring charges are expected to be
approximately $0.01 to $0.02 per share per
quarter for the remainder of 2004, based on
previously announced restructuring
activities.

55.  On May 25, 2004, the Company issued a press release

announcing the closings of its new senior secured credit

facilities, consisting of (i) a first lien secured facility

comprising a $50 million revolving credit facility and a $375

million term loan and (ii) a second lien secured facility

comprising a $155 million synthetic letter of credit facility,

and its previously announced Rule 144A private offering of 5.75%

convertible senior debentures, were completed yesterday.  The

press release continued, in pertinent part, as follows:

>Gross proceeds of the convertible debentures
>offering totaled $125 million.  Tower
>Automotive offered $110 million of
>convertible debentures, and the initial
>purchasers exercised an option to purchase an
>additional $15 million aggregate principal
>amount of debentures.  The debentures will
>mature in 2024, unless previously converted,
>redeemed or repurchased.  The issue price of
>the debentures was 100 percent of principal
>amount.
>
>The uses of the proceeds of the offering,
>along with borrowings under the new senior
>secured credit facilities, are to repay the
>existing senior credit facilities, call the
>existing $200 million 5.0% Convertible
>Subordinated Notes due August 1, 2004, pay
>related fees and expenses, and for general
>corporate purposes.
>
>Tower Automotive also announced that it
>issued a redemption notice to the trustee for
>the $200 million 5.0% Convertible
>Subordinated Notes due August 1, 2004.  The
>5.0% Convertible Subordinated Notes will be
>redeemed on June 25, 2004, at a purchase
>price of 100.714% of the aggregate principal
>amount, plus accrued and unpaid interest
>through the redemption date.
>
>The debentures and the shares of common stock
>issuable upon conversion thereof have not
>been and may not be offered or sold in the

United States absent registration under the
Securities Act of 1933 or an applicable
exemption from the registration requirements
of the Securities Act of 1933.

56. On July 27, 2004, the Company issued a press release
announcing its financial results for the second quarter of 2004,
the period ended June 30, 2004. For the quarter, the Company
reported revenues of $783 million and a net loss of $2.7 million,
or $0.05 per diluted share. Defendant Ligocki, commenting on the
results, stated, in pertinent part, as follows:

> Importantly, our new business launches remain
> on track.  Although the launch costs are
> challenging, we are meeting our timing and
> quality commitments.  Our second-quarter
> achievements also include completing the
> company's refinancing, which improves our
> liquidity and enables us to focus on
> continuing to drive operational excellence
> across the enterprise.

Concerning the Company's future outlook, the press release
stated, in pertinent part, as follows:

> The company anticipates 2004 third-quarter
> revenues to be between $725 million and $735
> million, with a loss ranging from $0.18 to
> $0.22 per diluted share.  Adjusted EBITDA of
> approximately $45 million to $55 million is
> expected in the third quarter.
>
> Full-year 2004 revenues are estimated to be
> approximately $3.15 billion, up from $2.8
> billion in 2003, but down by $50 million from
> the company's previous guidance of $3.2
> billion, due to lower production volumes than
> previously forecast.  Excluding restructuring
> charges, divestiture gains and certain
> non-recurring, non-cash charges, earnings per
> share are estimated in the range of $0.00 to
> $0.08 for the full year 2004. The change in

26

earnings outlook is due to lower production
volumes, increased financing costs and higher
launch costs.  The company anticipates full-
year Adjusted EBITDA of between $265 million
and $280 million.

57.  On October 28, 2004, the Company issued a press release

announcing its financial results for the third quarter of 2004,

the period ended September 30, 2004.  For the quarter, the

Company reported revenues of $722 million and a net loss of $20.2

million, or $0.35 per diluted share.  Defendant Ligocki,

commenting on the results, stated, in pertinent part, as follows:

Our focus on operational excellence and
expense control helped us through a
challenging quarter, despite continued high
steel costs and reductions in production
volumes on our key North American platforms.
While program launch costs were higher than
planned for the quarter, our launches remain
on schedule and we continue to meet all
customer quality commitments.

Concerning the Company's future outlook, the press release

stated, in pertinent part, as follows:

"Looking ahead, we expect the combination of
falling launch costs, efficiency gains and
accelerating organic revenue growth to lead
to improved earnings in the fourth quarter,"
said Ligocki.

Tower Automotive anticipates 2004
fourth-quarter revenues in the range of $830
million to $855 million, with a loss of $0.10
to breakeven per diluted share, excluding
restructuring charges.  The company expects
Adjusted EBITDA of approximately $67 million
to $75 million in the 2004 fourth quarter.

Full- year 2004 revenues are estimated in the
range of $3.12 billion to $3.14 billion, up

27

approximately 12 percent from $2.8 billion in
2003.  Excluding restructuring charges,
divestiture gains and certain non-recurring,
non-cash charges, the company expects a loss
per diluted share in the range of $0.50 to
$0.40 for the full year 2004. The company
anticipates full-year 2004 Adjusted EBITDA of
between $242 million and $250 million.

58.  On December 3, 2004, for the first time during the
Class Period, the Company announced that it has deferred the
dividend payment on the 6 3/4% trust convertible preferred
securities issued by the Tower Automotive Capital Trust.

59.  On January 4, 2005, the Company issued a press release
announcing that it obtained a $50 million accounts receivable
securitization facility through GE Commercial Finance.  The Press
release continued, in pertinent part, as follows:

The facility, which closed on December 30, is
a critical component of Tower Automotive's
strategy to offset the adverse impact to its
short-term liquidity from the termination of
the early payment programs at certain of the
company's North American automotive OEM
customers.  Upon closing, Tower Automotive
received net proceeds of approximately $44
million.

As part of that strategic plan, Tower
Automotive has worked with its customers to
find additional solutions to deal with the
elimination of the early payment programs.
Additionally, Tower Automotive will continue
to pursue a European factoring facility, and
expects to complete this later in the first
quarter of 2005.

As previously announced on December 3, 2004,
Tower Automotive deferred the dividend
payment of approximately $4.4 million on the
6 3/4% trust convertible preferred securities

28

issued by the Tower Automotive Capital Trust
that would have otherwise been paid on
December 31.  Deferring those payments and
obtaining the accounts receivable
securitization facility improves the
company's short-term liquidity position and
helps bring liquidity in line with its
projections for December 31, 2004 that the
company outlined in its third-quarter
earnings review.

60.  The statements referenced above in ¶¶ 45-59 were each
materially false and misleading when made because defendants
failed to disclose and/or misrepresented the following adverse
facts, which were known to defendants, or recklessly disregarded
by them, at all relevant times:

(a)  that the Company was facing increasing pressure
from automakers to dramatically lower its prices in order to
offset incentives that automakers were having to provide in order
to remain competitive;

(b)  that the costs of steel and other raw materials
were continuing to rise and would do so in the future, thereby
increasing expenses and, when combined with the squeeze being
placed on the Company by automakers, dramatically decreasing the
Company's earnings ability.  To the extent that Tower Automotive
purported to warn of the impact of rising materials' prices,
those warnings were generic in nature and did not advise
investors of the full extent of the risks and uncertainties faced
by the Company as a result of rising materials' prices;

(c)  that early pay programs that had been instituted

by automakers in 2001 which enabled automakers to pay suppliers
early for products and therefore get a discount were going to be
terminated, thereby depriving the Company of a primary source of
its liquidity;

(d) based on the foregoing, contrary to Defendants'
representations, the Company's financial condition was declining
precipitously such that the Company was nearing insolvency and
would have to file for bankruptcy; and

(e) based on the foregoing, defendants had no
reasonable basis for their positive statements regarding the
Company's ability to control its liquidity issues.

61. Then, on January 20, 2005, the Company issued a press
release announcing that longer-than-anticipated holiday shutdowns
at certain key customers would reduce liquidity by $40 million
during the first quarter of 2005. The press release continued,
in pertinent part, as follows:

> As previously announced, Tower Automotive has
> taken a number of initiatives to improve its
> liquidity position. Specifically, as
> previously announced on December 3, 2004,
> Tower Automotive deferred the dividend
> payment of approximately $4.4 million on the
> 6-3/4% trust convertible preferred securities
> issues by the Tower Automotive Capital Trust
> that would otherwise have been paid on
> December 31, 2004. Also, as previously
> announced on January 4, 2005, Tower
> Automotive obtained a $50 million accounts
> receivable securitization facility through GE
> Commercial Finance. That facility yielded
> net proceeds of approximately $44 million.

30

These and other initiatives were taken to
address the elimination of early payment
programs from the company's customers.  For
January, t hose changes in payment terms will
adversely impact liquidity by approximately
$17 million.

Despite Tower Automotive's efforts and the
continuing cooperation of its loyal customers
and dedicated suppliers, the company
continues to face significant challenges in
meeting its ongoing liquidity requirements.
Tower Automotive is continuing to work with
its customers and suppliers to address its
liquidity issues.  In addition, Tower
Automotive is continuing to pursue a European
factoring facility, the possible sale of
certain equipment and other liquidity
initiatives.

62.   On January 21, 2005, Standard & Poor's ("S&P") slashed

its rating on Tower Automotive saying that the Company may have

to restructure its finances unless business improves over the

next two quarters.  S&P cut Tower Automotive's corporate credit

rating by three notches to the deeply speculative "CCC"" level

from "B."

63.   On January 24, 2005, Moody's Investors Service cut its

ratings on Tower Automotive citing the rising potential for a

bankruptcy or financial restructuring at the auto parts maker.

Moody's cut Tower Automotive's senior implied rating by two

notches to "Caa1," the seventh highest junk rating, from "B2" and

its senior unsecured issuer rating by two notches to  "Ca, " the

10th- highest junk rating, from "Caa2."

64.   On February 2, 2005, the Company issued a press release

announcing that it and certain of its subsidiaries have filed to reorganize under Chapter 11 of the U.S. Bankruptcy Code in order to address liquidity needs and facilitate a debt restructuring.

## DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT TOWER AUTOMOTIVE STOCK WAS NOT A PRUDENT PLAN INVESTMENT

65.   At all relevant times, Defendants knew or should have known that Tower Automotive's misrepresentations concerning its financial condition and performance made Tower Automotive stock an imprudent Plan investment.  It is inconceivable that Defendants such as Tower Automotive's CEO Kathleen Ligocki and Dugald K. Campbell did not have personal knowledge of, if not a direct role in, the Company's misrepresentations regarding the true financial health of the Company throughout the Class Period.

66.   Defendants failed to conduct an appropriate investigation into whether Tower Automotive stock was a prudent investment and, in connection therewith, failed to provide the Plan participants with information regarding Tower Automotive's true financial health, such that other fiduciaries and the Plan participants could make informed decisions regarding Tower Automotive stock in the Plan, and otherwise failed to protect the Plan and its participants against inevitable losses.

67.   Defendants Ligocki and Campbell failure in this regard is particularly acute.  As a result of their role as Tower Automotive's CEO, Ligocki and Campbell simply had to have known, and at least tacitly approved of, the Company's improper

32

practices yet, upon information and belief, despite their
obligation to properly and materially inform Plan participants of
the true risks involved with holding Tower Automotive stock, they
remained silent.

68.  An adequate investigation by Defendants would have
revealed to a reasonable fiduciary that investment by the Plan in
the Tower Automotive stock, under these circumstances, was
imprudent.  A prudent fiduciary acting under similar
circumstances would have acted to protect participants against
unnecessary losses, and would have made a different investment
decision.

69.  Because Defendants knew or should have known that the
Tower Automotive stock was not a prudent investment option for
the Plan, they had an obligation to protect the Plan and its
participants from unreasonable and entirely predictable losses
incurred.

70.  Defendants had available to them several different
options for satisfying this duty, including: making appropriate
public disclosures as necessary; divesting the Plan of Tower
Automotive stock; discontinuing further matching and investment
contributions in Tower Automotive stock; consulting independent
fiduciaries regarding appropriate measures to take in order to
prudently and loyally serve the participants of the Plan; or
resigning as Plan fiduciaries to the extent that as a result of

their employment by Tower Automotive they could not loyally serve Plan participants in connection with the Plan's acquisition and holding of Tower Automotive stock.

**DEFENDANTS REGULARLY COMMUNICATED
WITH PLAN PARTICIPANTS CONCERNING
THE PURCHASE OF TOWER AUTOMOTIVE STOCK,
YET FAILED TO DISCLOSE THE IMPRUDENCE
OF INVESTMENT IN TOWER AUTOMOTIVE STOCK**

71. Upon information and belief, Tower Automotive regularly communicated with employees, including Plan participants, about Tower Automotive's performance, future financial and business prospects, and Tower Automotive stock. During the Class Period, the Company fostered a positive attitude toward Tower Automotive stock, and/or allowed Plan participants to follow their natural bias towards investment in the stock of their employer by not disclosing negative material information concerning investment in Tower Automotive stock. As such, Plan participants could not appreciate the true risks presented by investments in Tower Automotive stock and therefore could not make informed decisions regarding investments in the Plan.

**DEFENDANTS SUFFERED FROM CONFLICTS OF INTEREST**

72. Tower Automotive's SEC filings, including 10-K annual reports, during the Class Period make clear that a significant percentage of corporate Director and Executive Officer compensation is in the form of stock grants or stock option grants.

34

73.   Because the compensation was significantly tied to the price of Tower Automotive stock, Defendants had incentive to keep the Plan's assets heavily invested in Tower Automotive stock on a regular, ongoing basis.  Elimination of Company stock as a plan investment option would have reduced the overall market demand for Tower Automotive stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Tower Automotive stock, resulting in lower compensation for the Defendants.

74.   Some Defendants may have had no choice in tying their compensation to Tower Automotive stock (because compensation decisions were out of their hands), but Defendants did have the choice whether to keep the Plan participants' and beneficiaries' retirement savings tied up to a large extent in Tower Automotive stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

75.   These conflicts of interest put the Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and beneficiaries, in whose interests the Defendants were obligated to loyally serve with an "eye single."

## CLAIMS FOR RELIEF UNDER ERISA

76.   At all relevant times, Defendants were and acted as

fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

77.  ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

78.  ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

79.  ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in

the conduct of an enterprise of a like character and with like aims.

80.   These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law."  They entail, among other things,

(a)   The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

(b)   A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(c)   A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

81.   ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> ". . . in addition to any liability which he
> may have under any other provision of this
> part, a fiduciary with respect to a plan
> shall be liable for a breach of fiduciary

responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

82.  Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and ERISA § 405(a).

**CAUSATION**

83.  The Plan suffered at least millions of dollars in losses because the Plan were imprudently invested, or allowed to be invested by Defendants, in Tower Automotive stock during the Class Period, in breach of Defendants' fiduciary duties.  This loss was reflected in the diminished account balances of the Plan's participants.

84.  Defendants are responsible for losses caused by participant direction of investment in Tower Automotive stock because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant

control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants concealed material, non-public facts from participants, and provided misleading, inaccurate, and incomplete information to them regarding the true health and ongoing profitability of the Company, misrepresenting its soundness as an investment vehicle.  As a consequence, participants did not exercise independent control over their investments in Tower Automotive stock, and Defendants remain liable under ERISA for losses caused by such investment.

85.  Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Tower Automotive stock, eliminating Tower Automotive stock as an investment alternative when it became imprudent, and divesting the Plan from Tower Automotive stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in Tower Automotive stock.

### COUNT I

### Failure to Disseminate Necessary Information

86.  Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

87.   ERISA fiduciaries have a duty to speak truthfully, to not mislead participants, and to disclose truthful information on their own initiative when participants need such information to exercise their rights under the plan.  This duty to inform and disclose includes: (1) the duty to provide to plan participants material information of which the fiduciary has or should have knowledge that is sufficient to advise the average plan participant of the risks associated with investing in any particular fund; and (2) the duty to refrain from making material misrepresentations.

88.   A fiduciary must not only disclose complete and correct material information, but must provide information (even where not requested) if failing to convey the information would be harmful to participants.  In essence, a fiduciary must act to protect participants from losses when he knows or should know of facts that cast doubt on the soundness of certain plan investment alternatives.

89.   The Defendants breached their fiduciary duties by failing to provide Plan participants and beneficiaries with complete and accurate information regarding investment in Tower Automotive stock, including, but not limited to Tower Automotive's unlawfully inflationary accounting irregularities. The Defendants failed to disclose and/or misrepresented the following adverse facts, which were known to Defendants, or

40

recklessly disregarded by them, at all relevant times: (a) that the Company was facing intense pricing pressures to remain competitive; (b) that the costs of steel and other raw materials were continuing to significantly increase expenses and, when combined with the squeeze being placed on the Company by automakers, was dramatically decreasing the Company's earnings ability; (c) that early pay programs instituted by automakers were going to be terminated, thereby depriving the Company of a primary source of its liquidity; (d) based on the foregoing, contrary to Defendants' representations, the Company's financial condition was declining precipitously such that the Company's debt problems had become an impossible burden that would force the Company to file for bankruptcy; and (e) based on the foregoing, defendants had no reasonable basis for their positive statements regarding the Company's ability to control its liquidity issues.  Thus, the Company practices artificially inflated the value of Tower Automotive stock and misled participants and beneficiaries regarding the soundness and prudence of investing their retirement benefits in Tower Automotive stock during the Class Period.  This information was especially critical because investment in Tower Automotive stock was, by definition, an undiversified investment in a single company's common stock and, as such, carried with it an inherently high degree of risk.

41

**COUNT II**

**Breach of Duty to Prudently Manage and Invest Plan Assets**

90.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

91.   A fiduciary's duties of loyalty and prudence also entail a duty to continually monitor and, if necessary and prudent, conduct independent investigations into the relative merits of all the Plan's investments and of the investment alternatives available in a plan, including employer securities, to ensure that each investment is a suitable and prudent.

92.   Defendants breached this duty with respect to the Company stock investment.  By the beginning of the Class Period, if not before, Tower Automotive stock was plainly unsuitable and imprudent investment options for the Plan and its participants and beneficiaries.  By no later than the beginning of the Class Period, the defendants could and should have made a determination that Tower Automotive stock was not suitable and prudent investments for the Plan, and should have taken appropriate action, including adoption of a reasonable policy of divestment, elimination or restriction of further investment, corrective disclosure to Plan participants, and/or notification of the Secretary of Labor.

93.   The Defendants further breached their fiduciary duties

42

by not monitoring or putting in place procedures to monitor the actions of the Committee and/or any other employees designated by Tower Automotive to administer the Plan, and other Plan fiduciaries.

94.   Under ERISA, fiduciaries are responsible for the prudence of plan investments and liable for losses resulting from breach of their duty of prudence.  The defense to such liability provided for in ERISA § 404(c), 29 U.S.C. § 1104(c), is unavailable to Defendants here because the Plan and the Defendants administration thereof did not satisfy the requirements of the statute or the regulations promulgated thereunder.

### REMEDY FOR BREACHES OF FIDUCIARY DUTY

95.   The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above.

96.   As a consequence of the Defendants' breaches, the Plan suffered significant losses.

97.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary who breaches any of the duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate .

43

. . ."

98. With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the plan's assets to what they would have been if the plan had been properly administered.

99. Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (i) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (iii) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (iv) taxable costs and (v) interests on these

amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

100. Each defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for:

A.   A Declaration that the defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.   A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA 404(c)(l)(B), 29 U.S.C. § 1104(c)(l)(B);

C.   An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.   Imposition a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.   An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.   Actual damages in the amount of any losses the

45

Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.   An Order that Defendants allocate the Plan's recoveries to the accounts of all participants in proportion to the accounts' losses attributable to the decline in the stock price of Tower Automotive;

H.   An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.   An order awarding attorneys' fees pursuant 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.   An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

## <u>JURY TRIAL DEMAND</u>

Plaintiff demands trial by jury of all issues so triable.

Dated: April 25, 2005
      New York, New York

**GAINEY & MCKENNA**

_____/s/_____
Thomas J. McKenna (TJM 7109)
485 Fifth Avenue
3rd Floor
New York, New York 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

**Attorneys for Plaintiff**